UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHALOM GABAY,

                              Plaintiff,

                -against-

ROADWAY MOVERS, INC. and ROSS
SAPIR,

                           Defendants.

Case No. 1:22-cv-06901 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

        Plaintiff Shalom Gabay ("Plaintiff") filed this action on August 12, 2022 against his former employer, Defendant Roadway Movers, Inc. ("Roadway"), and Roadway's President, Ross Sapir ("Sapir" and, together with Roadway, "Defendants"), alleging that they violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.*, the Family Medical Leave Act of 1992 ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and various state laws. *See generally* ECF No. 1 ("Compl."). On October 14, 2022, after being permitted additional time to respond to the Complaint, Defendants moved to compel arbitration. ECF No. 14 ("Mot."); *see also* ECF No. 14-1 ("Brief in Support of Motion to Compel" or "Br."). On December 16, 2022, Plaintiff filed his brief in opposition to the motion to compel. ECF No. 21 ("Opp."). On January 13, 2023, Defendants filed their reply brief. ECF No. 24 ("Reply"). Because the Court concludes that Plaintiff falls within the narrow exemption set forth in Section 1 of the Federal Arbitration Act ("FAA"), Defendants' motion is DENIED.[1]

---

[1] Plaintiff also requested oral argument on the motion. *See* ECF No. 23. However, in the exercise of its discretion, the Court denies that motion as oral argument would not be helpful to the Court. *See AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 226 (2d Cir. 1999) (noting that "a district court's decision whether to permit oral argument rests within its discretion" (citation omitted)).

BACKGROUND[2]

Plaintiff Gabay, a resident of Florida, worked for Defendant Roadway for approximately 13 years.  Compl. ¶¶ 10-11.  For about six of those years, he worked as a long-distance truck driver for Roadway.  Gabay Decl. ¶ 2.  For the next seven years, until he was terminated, he worked as "Roadway's manager of long-distance moving."  *Id.*  As the manager of long-distance moving, Plaintiff contends – and Defendants do not dispute – that he was "directly involved on a daily basis in the transportation of household goods across state or international borders."  *Id*. ¶ 4.  In his role, Plaintiff directly supervised truck drivers who were moving customers' household goods long distances, including to other states and internationally.  *Id.*  Specifically, he directly supervised 25 drivers and orchestrated approximately 100 to 120 interstate moves per month.  *Id.*  Plaintiff planned and scheduled the interstate routes; he scheduled when the drivers would pick up and deliver the goods, devised the routes, and orchestrated the organization of the trailers, which included the belongings of multiple customers at one time.  *Id.* ¶ 5.  He communicated with the on-site loading managers to ensure that the trailers were loaded correctly, and in the right order for efficient loading and unloading.  *Id.*  He also coordinated with customer service to ensure customers were ready for their items to be picked up, and trained the "return load coordinator," who ensured that there were "shipments to load for the tractor trailers on their return trip to their point of origin."  *Id.*  He planned interstate trips himself, and also supervised and trained others who were planning interstate trips.  *Id.* ¶ 6.

---

[2] The facts stated herein are taken from Plaintiff's Complaint and the papers submitted by the parties in support of and in opposition to Defendants' motion to compel arbitration.  *See* ECF No. 14-2 ("Declaration of Ross Sapir" or "Sapir Decl."); ECF No. 14-3 ("September 2019 Arbitration Agreement" or "Arbitration Agreement"); ECF No. 21-1 ("Declaration of Shalom Gabay" or "Gabay Decl."); ECF No. 21-2 ("July 2019 Employee Handbook"); ECF No. 21-3 ("December 2019 Employment Agreement" or "Employment Agreement").

Plaintiff further alleges that he and his staff were responsible for assisting drivers when they "encountered unanticipated issues while transporting shipments on the interstate routes." *Id.* ¶ 7.  This sometimes involved "arranging for" separate, smaller trucks to transport a shipment to its final destination if the larger tractor trailer would not be able to maneuver a certain route. *Id.*  When problems arose, such as a breakdown, accident, or damage to property during transport, Plaintiff helped to solve those issues.  *Id.*  Finally, he and his staff were responsible for the maintenance, repairs, and tracking of all of the tractor trailers in Roadway's fleet.  *Id.* ¶ 8.

In 2015, during his employment, Plaintiff was diagnosed with brain cancer and began treatment.  *See generally* Compl.  That year, Plaintiff experienced a seizure at work, the doctors discovered a tumor, and Plaintiff underwent an operation.  *Id.* ¶ 24.  He underwent a second operation on November 2, 2020.  *Id.* ¶ 28.  Thereafter, he began a more intense regimen to treat the cancer, including radiation and chemotherapy treatments.  *Id.* ¶ 29.  Plaintiff alleges that despite his medical condition, Defendant Sapir required him to work extensive hours.  *See generally id*. ¶¶ 25-27 (alleging Plaintiff took four weeks off in 2015, but worked many 14-hour days, often worked seven days a week, and received an "Employee of the Year" recognition that same year); *see also* Gabay Decl. ¶ 23.  After his second surgery in 2020, Plaintiff returned to work on January 8, 2021 and claims that he requested to work a less-demanding schedule because of his ongoing treatments.  Compl. ¶ 30.  Plaintiff alleges that Sapir initially agreed to some form of this arrangement, but did not actually modify Plaintiff's schedule to make his hours less demanding.  *Id.* ¶¶ 31-33; *see also* Gabay Decl. ¶¶ 25-26.  Defendants disagree and contend that they accommodated Plaintiff's illness for six years – since 2015 – including by reducing his hours to three to five hours per day and scheduling him to work only a few days a

week.  Sapir Decl. ¶¶ 6-7.  These disputes, as well as Plaintiff's eventual firing – which he contends happened twice – are the primary subject of the Complaint.

Before reaching the merits of the claim, however, the parties disagree on the proper forum to hear this dispute.  In September 2019, Plaintiff signed "a Dispute Resolution Program Agreement" ("September 2019 Arbitration Agreement").  *See* September 2019 Arbitration Agreement.  The September 2019 Arbitration Agreement provides that, for "any dispute involving my employment with or termination from ROADWAY, or the interpretation or application of any ROADWAY policy, this Dispute Resolution Program Agreement or any other agreement I may have with ROADWAY shall be resolved by final and binding arbitration before one arbitrator designated by the American Arbitration Association . . . . This shall include, but not be limited to disputes concerning workplace discrimination, wage and/or overtime claims and/or all other statutory claims."  *Id.* at 3.  The agreement further states that "the Dispute Resolution Program shall be adjudicated pursuant to New York law . . . except for any disputes regarding the validity, coverage or enforceability of this Dispute Resolution Program Agreement or the arbitration provision contained herein, which shall be governed by the Federal Arbitration Act."  *Id.*

In December 2019, Plaintiff also signed an "At-Will Employment Agreement."  *See* Employment Agreement; Gabay Decl. ¶ 18.  That agreement contains a "Dispute Resolution" section, explicitly providing the following:

> I understand and agree that, as stated herein and within Roadway's Dispute Resolution Program Agreement I have entered in with the Company, any dispute involving my employment with the Company or the interpretation or application of this Agreement, will be resolved by final and binding arbitration before one arbitrator designated by the American Arbitration Association ("AAA"), pursuant to the then prevailing rules of AAA for the resolution of employment disputes, in New York, New York,

> whose decision will be final and binding and subject to entry in any court of competent jurisdiction. This will include, but not be limited to disputes concerning workplace discrimination, wage and/or overtime claims and/or all other statutory claims.

Employment Agreement § 14.

Finally, in July 2019, Roadway Movers Inc.'s Employee Handbook contained a "Dispute Resolution Program" provision that states "[a]ll disputes, of whatever nature, concerning your employment with Roadway Moving . . . shall be resolved by final and binding arbitration before one arbitrator designated by the American Arbitration Association ("AAA") . . . whose decision shall be final and binding[.]" July 2019 Employee Handbook at 48; *see* Gabay Decl. ¶¶ 10-13. The Employee Handbook provides extensive details about the Dispute Resolution Program. *See* July 2019 Employee Handbook at 48-50. The Employee Handbook also states that it was "written to serve as a guide for the employer/employee relationship." *Id.* at 1.

Plaintiff filed the instant action, alleging violations of the ADA, FMLA, and state law, based on Defendants' actions during his employment and for wrongfully terminating him. *See generally* Compl. Defendants have moved to compel arbitration, pointing to the September 2019 Arbitration Agreement. *See generally* Br. Plaintiff opposes the motion on several grounds, including that he is exempt as a transportation worker under the FAA and that the arbitration clause is unconscionable. *See generally* Opp. In reply, Defendants contend that the exemption does not apply because the September 2019 Arbitration Agreement is not a "contract of employment" under the FAA, and Plaintiff is not a transportation worker. *See generally* Reply. Defendants also dispute that the arbitration clause is unconscionable, but argue that this determination, in any event, should be made by the arbitrator. *Id.*

## LEGAL STANDARD

In considering a motion to compel arbitration under the FAA, 9 U.S.C. § 4, courts apply "a standard similar to that applicable for a motion for summary judgment." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)); *see also Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). Under this standard, "the Court must grant a motion to compel arbitration if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law." *Ryan v. JPMorgan Chase & Co.*, 924 F. Supp. 2d 559, 561-62 (S.D.N.Y. 2013). If the facts in the record are undisputed, and "require the matter of arbitrability to be decided against one side or the other as a matter of law," the Court "may rule on the basis of that legal issue and avoid the need for further court proceedings." *Meyer*, 868 F.3d at 74 (internal quotation marks and citation omitted).

When deciding a motion to compel arbitration, a court must generally decide the following: "(1) whether the parties agreed to arbitrate; (2) the scope of that agreement; and, (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable." *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 240 (S.D.N.Y. 2020) (internal quotation marks, ellipses, and citation omitted). "In interpreting an arbitration agreement, 'due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration.'" *Davarci v. Uber Techs., Inc.*, No. 20-cv-09224 (VEC), 2021 WL 3721374, at *5 (S.D.N.Y. Aug. 20, 2021) (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)).

**DISCUSSION**

**I.      Section 1 of the FAA**

Under Section 2 of the FAA, commercial "agreement[s] . . . to submit to arbitration" are generally "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2.  The statute "revers[ed] centuries of judicial hostility to arbitration agreements, [and] was designed to allow parties to avoid the costliness and delays of litigation, and to place arbitration agreements upon the same footing as other contracts." *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987)).  The Supreme Court has made clear that the FAA "establishes 'a liberal federal policy favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  In turn, "[b]y its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Daly*, 939 F.3d at 421 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

There is, however, an exception to this otherwise strict regime favoring arbitration. Section 1 of the FAA provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.  The last portion of this clause – "any other class of workers engaged in foreign or interstate commerce" – has been interpreted narrowly to "exempt[] from the FAA only contracts of employment of transportation workers," rather than all employment contracts of those engaged in foreign or interstate commerce.  *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001); *see also Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655,

657 (2d Cir. 2022) (noting that the FAA, which confers on the federal courts an expansive obligation to enforce arbitration agreements, "has an exclusion for contracts with 'seamen, railroad employees, [and] any other class of workers engaged in foreign or interstate commerce'" which has been "construed to cover 'transportation workers'" (quoting *Cir. City Stores, Inc.*, 532 U.S. at 119)).  The scope of this exemption, and particularly the standards for assessing both "contracts of employment" and "transportation workers," has been the subject of considerable recent case law, including by the Supreme Court.

In *New Prime Inc. v. Oliveira*, the Supreme Court considered whether "contracts of employment" included contracts between an employer and an independent contractor, rather than an employee.  139 S. Ct. 532, 541 (2019).  Before reaching that question, the Supreme Court clarified that a court, rather than the arbitrator, "should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration."  *Id.* at 537.  It then went on to conclude that "Congress used the term 'contracts of employment' in a broad sense to capture any contract for the performance of *work* by *workers*."  *Id.* at 541.  Therefore, an independent contractor falls within the scope of § 1 of the FAA because "'contracts of employment' refer[s] to agreements to perform work."  *Id.* at 543-44.

Shortly thereafter, in *Southwest Airlines Co. v. Saxon*, the Supreme Court considered whether an airline ramp supervisor was a "transportation worker" within the meaning of § 1 of the FAA.  142 S. Ct. 1783, 1790, 1793 (2022).  In concluding that, on the facts presented, the airline ramp supervisor was part of a "class of workers engaged in foreign or interstate commerce," the Court articulated how other courts should analyze the exemption.  *See id.* at 1788-90.  First, a court ought to "defin[e] the relevant 'class of workers'" to which the party resisting arbitration belongs.  *Id.* at 1788.  The Court clarified that the class is based on the

"actual work that the members of the class, as a whole, typically carry out" – not what the company "does generally." *Id.* In *Saxon*, the parties did not dispute that the airline ramp supervisors, including the defendant, "frequently load and unload cargo." *Id.* Therefore, the Court defined the class in *Saxon* to "workers who physically load and unload cargo on and off airplanes on a frequent basis." *Id.* at 1789. Notably, the Court expressly did not address whether supervisors who did *not* frequently load and unload cargo would qualify for the exemption in § 1. *Id.* at 1789 n.1.

After defining the class, the Supreme Court instructed that a court then must decide whether that class is "engaged in foreign or interstate commerce" under § 1. *Id.* at 1789. The *Saxon* Court made clear that "any class of workers directly involved in transporting goods across state or international borders falls within § 1's exemption." *Id.* "Put another way, transportation workers must be actively 'engaged in transportation' of . . . goods across borders via the channels of foreign or interstate commerce." *Id.* at 1790 (quoting *Cir. City Stores, Inc.*, 532 U.S. at 121). The Court then concluded that: "one who loads cargo on a plane bound for interstate transit is intimately involved with the commerce (*e.g.*, transportation) of that cargo." *Id.* The Court specifically rejected the plaintiff's more narrow reading, which would have defined "transportation workers" as only those who "physically move goods or people across foreign or international boundaries – pilots, ship crews, locomotive engineers, and the like . . . ." *Id.* at 1791. However, the *Saxon* Court also recognized that, unlike in the case before it, "the answer will not always be so plain when the class of workers carries out duties further removed from the channels of interstate commerce or the actual crossing of borders." *Id.* at 1789 n.2.

The Second Circuit has since considered at least one scenario that is less "plain" than the facts in *Saxon*. In *Bissonnette v. LePage Bakeries Park St., LLC*, the Second Circuit considered

whether the plaintiffs, who "deliver[ed] baked goods by truck to stores and restaurants in designated territories within Connecticut," fell within the § 1 exemption.  49 F.4th at 657.  The Second Circuit concluded that they did not fall under the exemption because the plaintiffs were part of the baking industry, and not the "transportation industry."  *Id.* at 662.  In coming to this conclusion, the *Bissonnette* court explained that settled Second Circuit case law made clear that "only a worker in a transportation industry can be classified as a transportation worker."  *Id.* at 661 (citing *Erving v. Va. Squires Basketball Club*, 468 F.2d 1064 (2d Cir. 1972) and *Md. Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979 (2d Cir. 1997)).  The Court clarified that "an individual works in a transportation industry if the industry in which the individual works pegs its charges chiefly to the movement of goods or passengers, and the industry's predominant source of commercial revenue is generated by that movement."  *Id.* at 661.

The *Bissonnette* court also distinguished the Supreme Court's decision in *Saxon*.  In *Saxon*, according to the Second Circuit, there was no need for the Court to "elaborat[e]" on the "point" that "only a worker in a transportation industry can be classified as a transportation worker" because in *Saxon*, "the plaintiff worked for an airline" which is "an analog to transport by rail and sea, is in the business of moving people and freight, and its charges are for activity related to that movement," not the other incidentals for which airlines charge.  *Id.*  Therefore, in *Saxon*, because the plaintiff was already clearly a member of the "transportation industry," the considerations in *Bissonnette* – namely, whether driving trucks as part of the *baking* industry qualified as membership in a transportation industry – did not come into play.  *Id.* at 661-62.  The Second Circuit held that because the plaintiffs in *Bissonnette* drove trucks as part of an industry in which the customers (stores and restaurants) "are not buying the movement of the baked goods," but just the baked goods themselves, they did not work in the transportation

industry, and any further inquiry into whether they were "transportation workers" – and thereby subject to the § 1 exemption – was unnecessary.  *See id.*

Therefore, under the controlling standard for a "transportation worker" under § 1 of the FAA, according to the Second Circuit, a court must first consider whether the class of workers is in the transportation industry, as articulated in *Bissonnette*; second, the court must consider the "actual work" carried out by that class to determine whether he or she is "engaged in foreign or interstate commerce" and is therefore a transportation worker.  *See Bissonnette*, 49 F.4th at 661; *Saxon*, 142 S. Ct. at 1789.

## II.    Analysis

Drawing from the binding precedent articulated above, the Court will now evaluate Plaintiff's claim that he cannot be compelled to arbitrate because he falls under the FAA § 1 exemption that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.

As a threshold matter, the parties do not dispute that this Court is the proper forum to determine the applicability of the exemption to Plaintiff.  Under the FAA, a court's authority to stay litigation and compel arbitration, though "considerable," is not unlimited.  *See Oliveira*, 139 S. Ct. at 537.  Because a court cannot compel arbitration for arbitration agreements that fall within § 1, the Court, rather than the arbitrator, "should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration."  *Id.*

### A.  "Contract of Employment"

Defendants argue that the exemption does not apply because the September 2019 Arbitration Agreement is not a "contract of employment" within the meaning of the FAA.  *See*

Reply at 2-5.  According to Defendants, "the parties' Arbitration Agreement is contained in a contract separate from the At-Will Employment Agreement . . .  such that the statutory exception for 'contracts of employment' is entirely inapposite."  *Id.* at 2.  Defendants contend that "a contract of employment is a 'contract between an employer and an employee in which the terms and conditions of employment are stated.'"  *Id.* at 3 (quoting *Awe v. I & M Rail Link, L.L.C.*, No. C04-3011 (PAZ), 2007 WL 2572405, at *4 (N.D. Iowa Sept. 4, 2007)); *see also id.* (citing *LaCross v. Knight Transp. Inc.*, No. CV-15-00990 (PHX)(JJT), 2016 WL 6082067, at *1 (D. Ariz. Oct. 18, 2016)); *id.* at 4 (quoting *Garza Nunez v. Weeks Marine, Inc.*, No. CIV. A. 06-3777, 2007 WL 496855, at *3 (E.D. La. Feb. 13, 2007)).  Therefore, according to Defendants, because the terms and conditions of Plaintiff's employment are not stated in the September 2019 Arbitration Agreement, the exemption does not apply here.  The Court disagrees.

First, Defendants' focus on the September 2019 Arbitration Agreement in isolation ignores that the December 2019 Employment Agreement – containing the terms and conditions of Plaintiff's employment – specifically incorporates the September 2019 Arbitration Agreement by its express terms.  The Employment Agreement provided that, "as stated herein and within Roadway's Dispute Resolution Program Agreement [Plaintiff has] entered in with the Company, any dispute involving [his] employment with the Company or the interpretation or application of this Agreement, will be resolved by final and binding arbitration before one arbitrator  . . . ."  Employment Agreement § 14.  The Employment Agreement then goes on to describe the AAA arbitration process to which Plaintiff is ostensibly bound and details that this alternative dispute process governs workplace discrimination, statutory claims, and others.  *Id.*  Therefore, an agreement to arbitrate was clearly part of Plaintiff's contract of employment with Defendants.

In addition, the "Dispute Resolution Program" of arbitration was expressly included in the Employee Handbook that governed the terms and conditions of Plaintiff's employment. *See* July 2019 Employee Handbook at 48-50; *see also Patterson v. Raymours Furniture Co.*, 96 F. Supp. 3d 71, 76 (S.D.N.Y. 2015) (holding that arbitration provision in employee handbook was enforceable agreement to arbitrate and that "[i]t is well-settled that revisions to an employee handbook are binding when the employee continues to work after receiving notice of the revisions"); *Brown v. St. Paul Travelers Cos.*, 559 F. Supp. 2d 288, 292 (W.D.N.Y. 2008) (enforcing arbitration agreement in employee handbook). The Court need not address the enforceability of an arbitration agreement in the employee handbook alone because, as mentioned previously, this arbitration agreement was consistent with that set forth in the September 2019 Arbitration Agreement and the December 2019 Employment Agreement. This documentation, as a whole, shows that Plaintiff had a contract of employment with Defendants that included the terms and conditions of his employment (assuming such a requirement), which contained an arbitration obligation under the FAA.

The cases relied upon by Defendants are distinguishable from the case at hand. *Awe v. I & M Rail Link, L.L.C.*, on which Defendants rely heavily, is an Iowa case where plaintiff arguably waived the argument that plaintiff was covered by the transportation worker exemption but then sought to vacate an arbitration award after it was entered against him on that, and other, bases. 2007 WL 2572405, at *2-3. The court held that the exemption did not apply where the agreement to arbitrate was contained in a separate incentive and severance agreement that was presented to the plaintiff when there was a potential change of control of the employer. *Id.* at *1. Unlike here, the separate agreement in *Awe* provided for additional benefits to the employee ("a 5% retention incentive and, in certain circumstances, severance pay") through the separate

agreement.  2007 WL 2572405, at *4.  Indeed, most of the cases cited by Defendants dealt with arbitration agreements entered into in exchange for an additional benefit, such as a salary advance or to release claims for injury – again, neither of which is present here.  *See Garza Nunez*, 2007 WL 496855, at *3 (arbitration agreement made in response to offer of salary advance); *Schreiber v. K-Sea Transp. Corp.*, 9 N.Y.3d 331, 337 (2007) (arbitration agreement entered into in response to worker's injury); *Terrebonne v. K-Sea Transp. Corp.*, 477 F.3d 271, 274, 280 (5th Cir. 2007) (same).  For instance, in *Harrington*, the Second Circuit considered an arbitration agreement between a seaman and his employer, which was entered into after the seaman was injured on the job.  *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 116 (2d Cir. 2010).  The seaman agreed to arbitrate his claims, and in exchange, the employer agreed to advance 60% of gross wages as an "advance against settlement" for that injury.  *Id.*  Therefore, the court found that the agreement to arbitrate was not a contract of employment, and § 1 exemption did not apply.  *See id.* at 121.

Even if the arbitration agreement here was only contained in the September 2019 Arbitration Agreement, which is not the case, that agreement was not made in exchange for a separate pay out, release of claims, or other consideration, unlike the cases relied on by Defendants.  Rather, no additional consideration was provided to Plaintiff, the September 2019 Agreement replicated the arbitration provision that was already in the Employee Handbook that covered Plaintiff, and it continued to be incorporated in Plaintiff's subsequent Employment Agreement with Defendants.

*Abram v. C.R. England, Inc.*, No. CV-20-00764 (MWF) (MRWx), 2020 WL 5077365, at *3 (C.D. Cal. Apr. 15, 2020) is instructive.  In *Abram*, like here, even though the employee signed a stand-alone agreement to arbitrate, it was not made in exchange for any separate

consideration, as in *Harrington* or the other cases cited by Defendants.  *See id.*  As here, the

agreement in *Abram* covered "a broad range of claims, including employment-related disputes."

*Id.*  The court explained that it was "not persuaded that the Arbitration Agreement is not part of

the Parties' comprehensive 'contract of employment.'"  *Id.*  It noted that, if the court did not

consider the Arbitration Agreement as part of the contract of employment, it would be reading

the § 1 exemption "in a manner that completely eviscerates its purpose."  *Id.* at *4.  The court

explained what would happen if the court adopted the employer's theory:

> An otherwise covered employer could circumvent section one [of
> the FAA] by simply presenting employees with a contract
> outlining all terms and conditions of employment, followed by a
> separate arbitration agreement, even if that agreement compels
> arbitration of employment disputes. Congress could not have
> intended covered employers to avoid the exclusion so easily.

*Id.* at *4.  There is an even stronger argument here that the September 2019 Arbitration

Agreement covering employment disputes against Defendants, among other claims, was part of

Plaintiff's comprehensive "contract of employment" given that the arbitration obligations were

also included in Plaintiff's Employment Agreement and Employee Handbook.[3]

---

[3] Defendants' additional cases do not alter the Court's conclusion.  For instance, the court in
*LaCross v. Knight Transp. Inc.* found that an independent contractor's agreement was not an
"employment contract" within the meaning of § 1, a holding that is (a) irrelevant here given that
Plaintiff is undisputedly not an independent contractor and (b) one with which the Supreme
Court subsequently disagreed in *Oliveira*.  *Compare* 2016 WL 6082067, at *2 with *Oliveira*, 139
S. Ct. at 541.  In *Davila v. Roadway Moving & Storage, Inc.*, 2020 N.Y. Misc. LEXIS 412,
Index No. 22226/2019E, NYSCEF Doc. No. 24 (Sup. Ct. Bronx Cnty. May 13, 2020), the court
made only a passing reference to § 1 of the FAA in dicta, noting that the question of the FAA
exclusion should be determined by the arbitrator, again a holding at odds with the Supreme Court
in *Oliveira*.  *Compare Davila* at 11-12; with *Oliveira*, 139 S. Ct. at 537.  Finally, in *Daniels v.
Aaron's, Inc.*, No. 19-cv-6421 (CJS), 2020 WL 5810018, at *5 (W.D.N.Y. Sept. 30, 2020), the
court did not analyze the transportation exemption under § 1 of the FAA but evaluated a
standalone arbitration agreement for unconscionability.

### B.  Transportation Worker

Defendants next argue that Plaintiff is not a transportation worker that qualifies for the exemption under Section 1.  Defendants claim that Plaintiff is not engaged in the interstate transportation of goods because he merely supervises long-distance movers, and does not physically move the goods himself.  *See* Reply at 5-7.

In evaluating whether Plaintiff is a transportation worker, the Court must first determine whether Plaintiff, during his employment at Roadway, "work[ed] in a transportation industry." *Bissonnette*, 49 F.4th at 661.  "[A]n individual works in a transportation industry if the industry in which the individual works pegs its charges chiefly to the movement of goods or passengers, and the industry's predominant source of commercial revenue is generated by that movement." *Id.*  Like an airline, railroad, or sea merchant, a moving company such as Roadway satisfies this standard fairly easily.  In contrast to the baking company in *Bissonnette*, a moving company like Roadway is clearly "in the business of moving people and freight."  *Id.*  Moreover, Roadway derives its revenue chiefly from that movement, and not primarily from incidentals such as packing materials.  *See id.*  Thus, Plaintiff worked in a transportation industry during the time relevant to this dispute.

The next and closer question is whether Plaintiff falls within a class of workers that is engaged in interstate commerce under *Saxon*.  As articulated in *Saxon*, the Court must first define the class based on the "actual work that the members of the class, as a whole, typically carry out." *Saxon*, 142 S. Ct. at 1788.  Plaintiff has described himself as Roadway's manager of long-distance moving.  *See* Gabay Decl. ¶ 2.  Defendants do not dispute this.  *See* Sapir Decl. ¶ 5 ("Since approximately 2014, Plaintiff has been employed as a Long Distance Operations Manager . . . .").  Defendant Sapir articulated the duties for this role, briefly, as follows: "Plaintiff's duties consisted of planning moves for customers, managing drivers and other

personnel, ensuring high standards of customer service, and similarly managerial and administrative functions within Roadway, such as scheduling, payroll, and budgeting."  Sapir Decl. ¶ 5.

Plaintiff's characterization of his duties is more detailed, but does not conflict with Defendants' summary.  Plaintiff contends that he directly supervised 25 drivers who were moving customers long distances, including to other states and internationally, and orchestrated approximately 100 to 120 interstate moves per month.  Gabay Decl. ¶ 4.  According to Plaintiff – and undisputed by Defendants –  Plaintiff planned and scheduled the interstate routes, including scheduling when drivers would both pick up and deliver the goods, mapping out the routes, and overseeing the organization of the trailer tractors.  *See id.* ¶ 5. Among other things, Plaintiff was also responsible for assisting drivers when they "encountered unanticipated issues while transporting shipments on the interstate routes." *Id.* ¶ 7.  His work sometimes involved "arranging for" different trucks to take a shipment to its destination if the roads were narrow, or assisting with breakdowns, accidents, or damage to property. *Id.*  Plaintiff and his staff also maintained the tractor trailers that were used for long distance moves. *Id.* ¶ 8.  The parties generally do not dispute these responsibilities, and agree that Plaintiff served in a supervisory role during the relevant time period.  Therefore, as relevant here, Plaintiff belongs to a class of workers who directly supervise, through planning, scheduling, and otherwise orchestrating, long-distances moves. *Cf. Saxon*, 142 S. Ct. at 1789.

However, the parties vigorously dispute whether the class of supervisors of long-distance moves is "engaged in foreign or interstate commerce." *See id.*  The test, as articulated by the *Saxon* Court, is whether the class of workers is "actively 'engaged in transportation' of . . . goods across borders via the channels of foreign or interstate commerce." *Id.* at 1790 (quoting *Circuit*

*City Stores, Inc.*, 532 U.S. at 121).  Notably, the *Saxon* Court explicitly refused to decide whether a supervisor who did not frequently load and unload cargo – that is, who did not physically partake in the movement of goods – would qualify for the exemption in § 1.  *Id.* at 1789 n.1.  It did, however, reject a narrow view of the exemption that would necessarily limit transportation workers to only those who "physically move goods or people across foreign or international boundaries – pilots, ship crews, locomotive engineers, and the like . . . ."  *Id.* at 1791.

Since *Saxon*, there appears to be little recent case law in which courts have determined whether supervisors over interstate commerce are "transportation workers" for purposes of § 1.  Plaintiff cites to two cases that directly addressed the issue prior to *Saxon*.  In *Palcko v. Airborne Express, Inc.*, the Third Circuit concluded that the plaintiff – a supervisor of about 30 to 35 truck drivers who delivered packages to and from the defendant to customers – was part of a class of "transportation worker[s]" because "she was responsible for monitoring and improving the performance of drivers under her supervision to ensure timely and efficient delivery of packages."  372 F.3d 588, 590, 593 (3d Cir. 2004) (internal alterations adopted & quotation marks omitted).  The Third Circuit concluded that "[s]uch direct supervision of package shipments makes [plaintiff]'s work 'so closely related to interstate and foreign commerce as to be in practical effect part of it.'"  *Id.* (quoting *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am., (U.E.) Loc. 437*, 207 F.2d 450, 452 (3d Cir. 1953)) (alterations adopted).  In *Zamora v. Swift Transp. Corp.*, the court came to a similar conclusion.  No. EP-07-CA-00400 (KC), 2008 WL 2369769, at *9 (W.D. Tex. June 3, 2008).  There, the plaintiff was a supervisor of a terminal for a trucking company, who oversaw the operations of the terminal, and was responsible for "the monitoring and improving of performance of the operation of the

transportation company." *Id.* The plaintiff was also "critical to the operation of the trucks, the trucking terminal, and the trucking company, significant instrumentalities of interstate commerce." *Id.* Therefore, the court concluded that the plaintiff fell within the § 1 exemption. *Id*. In light of Plaintiff's direct supervision of at least 25 interstate drivers, his planning of interstate routes, and his monitoring of the shipments, the present case appears to be on all fours with *Palcko* and *Zamora*, which the Court finds persuasive.[4]

In addition, there are some guideposts from the Second Circuit in *Bissonnette* to assist the Court in determining whether Plaintiff is a transportation worker for purposes of § 1 of the FAA. In *Bissonnette*, the district court applied a factor-based test similar to the one articulated by the Eighth Circuit in *Lenz v. Yellow Transportations, Inc*., 431 F.3d 348, 352 (8th Cir. 2005). *See* 49 F.4th at 662. Those factors include:

> [F]irst, whether the employee works in the transportation industry; second, whether the employee is directly responsible for transporting the goods in interstate commerce; third, whether the employee handles goods that travel interstate; fourth, whether the employee supervises employees who are themselves transportation workers, such as truck drivers; fifth, whether, like seamen or railroad employees, the employee is within a class of employees for which special arbitration already existed when Congress enacted the FAA; sixth, whether the vehicle itself is vital to the commercial enterprise of the employer; seventh, whether a strike by the employee would disrupt interstate commerce; and eighth, the nexus that exists between the employee's job duties and the vehicle the employee uses in carrying out his duties (i.e., a truck

---

[4] Defendants argue that the Court should not follow these cases because more recent case law such as *Saxon* and *Holley-Gallegly v. TA Operating LLC*, No. EDCV 22-593 (JGB) (SHKx), 2022 WL 9959778, at *3 (C.D. Cal. Sept. 16, 2022), make clear that § 1 should be interpreted narrowly. Reply at 7. The Court is not persuaded. First, the *Saxon* Court explicitly left open the question of whether a supervisor who did not also assist with the loading of the airplane would qualify as a transportation worker. *Saxon*, 142 S. Ct. at 1789 n.1. And, second, in *Holley-Gallegly*, the plaintiff was a mechanic who only worked on the trucks; he was not otherwise involved in the interstate commerce, and the court deemed that limited connection to be "not enough." 2022 WL 9959778, at *3. This is factually inapposite from the case at hand.

> driver whose only job is to deliver goods cannot perform his job
> without a truck).

*Id.* (quoting *Lenz*, 431 F.3d at 352).  The *Bissonnette* court, in affirming the district court's

motion to compel arbitration, did not "reject[] or adopt[] the district court's analysis," because

the plaintiff did not work in the transportation industry, but noted that the framework from *Lenz*

"may very well be a way to decide closer cases."  *Id.* at 657.  In discussing the district court's

analysis, the *Bissonnette* court did not "identify . . . error in the district court's conscientious

analysis" where the "district court relied upon certain *Lenz* factors, but not all, and not

explicitly."  *Id.* at 662.  Given the Second Circuit's nod to this approach, the Court will utilize

the *Lenz* factors to assist in its analysis of whether a supervisor of long-distance movers, who did

not physically drive the moving trucks, is a transportation worker for purposes of § 1 of the

FAA.

First, the Court has already concluded that Plaintiff works in the transportation industry.

This factor weighs in favor of finding he is a transportation worker.  Second, while Plaintiff

orchestrated and planned the movement of goods, he did not personally drive the goods over

state lines.  Nevertheless, his duties made him directly responsible for the successful transport of

the goods across state lines.  For instance, he planned the routes, assisted with organizing the

trailers, was in direct contact with drivers, monitored the shipments, and maintained the fleet of

trailers.  *See* Gabay Decl. ¶¶ 4-9.  This factor weighs in favor of finding Plaintiff to be a

transportation worker.  *See Zamora*, 2008 WL 2369769, at *7 (concluding second *Lenz* factor

weighed "heavily" in favor of finding supervisor was a transportation worker).  As to the third

factor, although Plaintiff ensured that the "loads were accurate; that there was enough space in

the trailer for the loads; that we utilized the available space in the trailer in the most efficient

way; [and] that everything was loaded in the correct order," Gabay Decl. ¶ 5, there is no

evidence that Plaintiff "handle[d] goods that travel interstate," *Bissonnette*, 49 F.4th at 662

(quoting *Lenz*, 431 F.3d at 352).  Therefore, this factor weighs against finding Plaintiff to be a

transportation worker.  However, Plaintiff directly and actively supervised the movement of the

goods interstate.  Since he "supervise[d] employees who are themselves transportation workers,

such as truck drivers" – the long-distance movers themselves – the fourth factor weighs in favor

of finding him to be a transportation worker.  *Id*. (quoting 431 F.3d at 352).

       The fifth *Lenz* factor asks the Court to consider "whether, like seamen or railroad

employees, the employee is within a class of employees for which special arbitration already

existed when Congress enacted the FAA."  *Id*. (quoting 431 F.3d at 352).  There is no evidence

in the record as to this factor either way, so the Court concludes it is neutral.  "The sixth and

seventh factors, the importance of vehicles to the employer's business and the impact that a

strike by the employee on interstate commerce, both weigh in favor of finding [Plaintiff] to be a

transportation worker under the FAA."  *Zamora*, 2008 WL 2369769, at *8.  The tractor trailers,

which Plaintiff and his staff maintained, were certainly vital to long-distance moves; but even

more so, Plaintiff planned the routes and monitored the shipment to assist if problems arose.  In

light of these significant duties, a strike by Plaintiff and other supervisors would likely result in a

significant disruption of the planning and oversight of a complex long-distance moving industry.

The eighth factor – "the nexus that exists between the employee's job duties and the vehicle the

employee uses in carrying out his duties" – also weighs in favor of finding Plaintiff to be a

transportation worker because, as in *Zamora*, "[t]hough [he] . . . rarely drove a truck as part of

his job, the truck is integral to his job responsibilities" as a supervisor of long-distance movers,

*see id.* at *6, 8, and he "managed the maintenance of all tractors and trailers" including by

"keeping track of which ones were in reservice, and when repairs on out-of-service vehicles

would be complete," Gabay Decl. ¶ 8.  Therefore, the first, second, fourth, sixth, seventh, and eighth *Lenz* factors all weigh in favor of finding Plaintiff to be a transportation worker.

As the Third Circuit noted, limiting "transportation workers" to those workers "who physically move the packages" would "unnecessarily narrow the section 1 exemption in a way never intended by the FAA; had Congress intended the residual clause of the exemption to cover only those workers who physically transported goods across state lines, it would have phrased the FAA's language accordingly."  *Palcko*, 372 F.3d at 593-94.  The Court is unaware of a court limiting the FAA exemption in such a narrow way, and the Court in *Saxon* explicitly rejected such a limitation.  *Saxon*, 142 S. Ct. at 1791.

Having concluded that Plaintiff works in the transportation industry and fits into a class of workers who are engaged in interstate commerce, as articulated in *Saxon* and *Bissonnette*, and having concluded that the *Lenz* factors also weigh in Plaintiff's favor, the Court concludes that Plaintiff is part of a class of transportation workers "engaged in foreign or interstate commerce." *Saxon*, 142 S. Ct. at 1788-90.

In sum, because Plaintiff has demonstrated that he falls under the exemption that covers "contracts of employment" for "transportation workers" under § 1 of the FAA, the Court cannot compel arbitration.[5]

## CONCLUSION

For the aforementioned reasons, Defendants' motion to compel arbitration is DENIED. The parties shall file a joint letter, including a Proposed Civil Case Management and Scheduling

---

[5] Defendants have not argued that arbitration may be compelled under state law, as opposed to the FAA.  Therefore, the Court does not address the arguments raised by Plaintiff regarding state law.  *See* Opp. at 13-21.  Moreover, in light of the Court's conclusion that it cannot compel arbitration pursuant to § 1 of the FAA, it does not address Plaintiff's arguments that the agreement is unconscionable or otherwise unenforceable.

Order, available at https://www.nysd.uscourts.gov/hon-jennifer-l-rochon, within 14 days of the

date of this Order.

The Clerk of Court is respectfully directed to terminate the motions pending at ECF

Nos. 14 & 23.

Dated:  April 28, 2023
        New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge